115 P.3d 1065 (2005)
Dennis Neil GRIFFITH, Respondent and Cross-Appellant,
v.
SCHNITZER STEEL INDUSTRIES, INC., an Oregon Corporation; General Metals of Tacoma, Inc., a Washington Corporation; and Jay Robinovitz, individually, and the marital community composed of Jay Robinovitz and "Jane Doe" Robinovitz, husband and wife, Appellants and Cross-Respondents.
No. 31130-5-II.
The Court of Appeals of Washington, Division Two.
July 19, 2005.
*1067 William Robert Hickman, Pamela A. Okano, Reed McClure, Seattle, WA, for Appellant/Cross-Respondent.
Guy Jeffrey Sternal, Jennifer Ann Wing, Attorneys at Law, Tacoma, WA, for Respondent/Cross-Appellant.
QUINN-BRINTNALL, C.J.
¶ 1 In 1995, Schnitzer Steel Industries, Inc. promoted Dennis Griffith to general manager of its Tacoma scrap metal facility. At that time, Griffith was 52 years old and Schnitzer Steel knew he was a member of the Church of Latter Day Saints. After Griffith was discharged in 2000, he brought suit alleging discrimination on the basis of his age and religious beliefs. Griffith's evidence of religious discrimination consisted of the following: his beliefs that Schnitzer Steel's management was predominately Jewish and that "Jews and Italians" controlled the scrap metal industry and Jewish individuals "stick together;"[1] polygamy jokes told by an employee not responsible for Griffith's job status; and a Schnitzer Steel competitor's comment questioning how Griffith got to be manager of the Tacoma facility when he was not Jewish. As to age discrimination, Griffith pointed to his replacement being younger, but testified only that the claim was brought because "I don't have anything that I can lay a tangible hold on as to why I was released." 5 Report of Proceedings (RP) (June 25, 2003) at 848. A jury found for Griffith and this appeal ensued.
¶ 2 Griffith's case required him to rebut numerous justifications proffered for his discharge and to present sufficient evidence explaining why, if his employer was opposed to a mid-50s Mormon[2] general manager, it had promoted him to that position only four years earlier when it knew of his age and religious faith. Griffith satisfied neither burden: he failed to show that the reasons for his discharge were unworthy of belief; his evidence of religious discrimination was not attributable to those responsible for his discharge; and he presented no evidence of age discrimination. We therefore reverse.

FACTS
¶ 3 In March 1995, Schnitzer Steel purchased General Metals of Tacoma, Inc., whose holdings included a scrap metal facility *1068 in Tacoma. Schnitzer Steel's founder, Leonard Schnitzer, and its president, Bob Philip, visited the Tacoma facility shortly after the purchase and met with Griffith, the facility's 52-year-old operations manager. During the meeting, Griffith asked Leonard Schnitzer and Philip if they would be opposed to him coming into work late on days that he taught a Mormon seminary class. Although Griffith offered to stop teaching, he was told that it would not be a problem and that he should continue to teach the class. A short while later, Leonard Schnitzer and Philip promoted Griffith to general manager of the Tacoma facility and gave him a $20,000 raise.
¶ 4 From Griffith's promotion through January 1998, the Tacoma facility made a profit of approximately $23 million. During this time, Griffith received glowing annual performance reviews from Philip and was repeatedly told by Schnitzer Steel management that he "walk[ed] on water." 2 RP (June 19, 2003) at 277. But in 1998 and 1999, the facility lost more than $5 million. This loss occurred even after $15 million in improvements were made to the facility. And, in 1999, one of the facility's largest clients complained to Schnitzer Steel's management about how the facility was being run.
¶ 5 In May 1999, Schnitzer Steel's management demoted Griffith to assistant general manager and made Jay Robinovitz general manager. Robinovitz was 42 years old, Jewish, and had been the general manager of another Schnitzer Steel scrap metal facility. Robinovitz was, by Griffith's own admission, a more experienced general manager whose "hands on" management philosophy differed from Griffith's preference for "delegating responsibility, for the managers to take responsibility." 5 RP (June 25, 2003) at 917. The two employees repeatedly discussed Robinovitz's concerns regarding Griffith's management at the facility.
¶ 6 Robinovitz would later testify that while he came to the Tacoma facility with the authority to terminate Griffith, the goal was "to come in and find out what were [Griffith's] real talents, how did they fit in the company, whether it was in Tacoma or somewhere else or somewhere within this team, and was there a position that he was really suited for outside of the general manager spot." 9 RP (July 2, 2003) at 1582. According to Robinovitz, he lost faith in Griffith as he discovered several disturbing management practices:[3] (1) Griffith had avoided paying overtime to employees who picked up scrap metal from customers by requiring the transactions to be undocumented with the customers paying the employees in cash; (2) Griffith permitted a policy with union employees that they would earn a $.20 per hour quarterly bonus if they did not document work-related injuries; (3) Griffith permitted an employee to run and keep all profits from an undocumented "company" store that sold food, cigarettes, and equipment; (4) Griffith let unprocessed scrap metal accumulate in the facility to an amount Robinovitz had never seen; (5) Griffith authorized the purchase of scrap metal containing asbestos; and (6) the facility's monthly operating costs were routinely $300,000 to $400,000 more than other comparable Schnitzer Steel scrap metal facilities.
¶ 7 Robinovitz also testified that he became troubled by Griffith's management style. According to Robinovitz, Griffith's approach had made him ignorant of several improper business practices and incidents: (1) the facility inventory-tracking method produced a discrepancy of $847,000 in inventory that the facility did not have; (2) a customer had been given a key to the facility and had been authorized to take liquid oxygen (an extremely hazardous chemical) free of charge and without employee assistance or protective equipment; (3) an employee who lost his leg in an on-the-job accident repeatedly complained without avail about the lack of disability parking at the facility; (4) an employee had advanced, without documentation or security, $200,000 in cash and equipment to a customer that had filed for bankruptcy; and *1069 (5) an employee had run up a $50,000 repair bill on a truck worth $24,000.
¶ 8 When Robinovitz took over management, he instituted new policies and discontinued Griffith's questionable practices. In June 2000, Robinovitz terminated Griffith's employment.
¶ 9 Griffith sued Schnitzer Steel and Robinovitz, alleging that he was discharged based on his age and religious faith. At trial, Griffith testified that age might have been a factor in his termination because Robinovitz was younger than him. But Griffith also testified that he brought the age claim because "I don't have anything that I can lay a tangible hold on as to why I was released." 5 RP (June 25, 2003) at 848.
¶ 10 As to the religious discrimination claim, Griffith opined that his faith was an issue because Schnitzer Steel had several individuals in management who were Jewish. This included Leonard Schnitzer, Philip, Robinovitz, the chief financial officer, and the general managers of three scrap metal facilities. According to Griffith, the scrap metal industry was controlled by the "Jews and Italians" and individuals who are Jewish "have a tendency to stick together." 5 RP (June 25, 2003) at 777.
¶ 11 To support his claim, Griffith testified how polygamy jokes were occasionally told at Schnitzer Steel management functions by the general manager of another scrap metal facility. Griffith stated that the jokes were "always formulated that `you guys don't have any problem with women because you can have more than one, so if you don't like one, you can go with the next one.'" 4 RP (June 24, 2003) at 662-63. Griffith found it "interesting" that the jokes were told because "the policy in the Schnitzer organization is that is a total taboo. You don't tell jokes about anybody of any nationality, any origin, or anything else, and you don't send e-mails in the same vein, and they stressed that in the management meetings that we attend." 9 RP (July 2, 2003) at 1777. Griffith testified that after two such incidents, Schnitzer Steel's in-house counsel came up to him and apologized.
¶ 12 Griffith also testified about an incident at the Tacoma facility involving Jeffrey Neu, an employee of a competitor company that was engaged in a joint venture with Schnitzer Steel. According to Griffith, Neu had visited because Philip was boasting of Griffith's exceptional performance. During the visit, Neu asked Griffith, "Why are you running this yard? You're not Jewish." 4 RP (June 24, 2003) at 715. Griffith believed at the time that the comment "was as much a compliment as it could have been taken the other way. I was running a very successful operation and did so through January of `98." 4 RP (June 24, 2003) at 716.
¶ 13 Schnitzer Steel and Robinovitz brought motions for judgment as a matter of law at the close of Griffith's case-in-chief and before the case was submitted to the jury. The trial court denied these motions except for dismissing the religious discrimination claim against Robinovitz due to insufficient evidence.
¶ 14 The jury found for Griffith on the remaining religious and age discrimination claims and awarded him $2,026,500 in damages. This appeal followed.

ANALYSIS
¶ 15 The Washington Law Against Discrimination, chapter 49.60 RCW, prohibits an employer from discharging any employee on the basis of, among other things, age or religious beliefs. RCW 49.60.180(2). An employee makes a prima facie case of discriminatory termination if the employee shows that he (1) belongs in a protected class; (2) was discharged; (3) was doing satisfactory work when the termination decision was made; and (4) was replaced by someone not in the protected class. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Chen v. State, 86 Wash.App. 183, 189, 937 P.2d 612, review denied, 133 Wash.2d 1020, 948 P.2d 387 (1997).[4] In an age discrimination claim, the *1070 protected class is individuals between 40 and 70 years of age, but the employee is not required to show that he was replaced by someone outside that range; he need only show that he was replaced by someone significantly younger. Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 188, 23 P.3d 440 (2001); Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 362, 753 P.2d 517 (1988).[5]
¶ 16 Once the employee presents a prima facie case, a presumption of discrimination exists and the employer must produce evidence of legitimate, nondiscriminatory reasons for the termination. Grimwood, 110 Wash.2d at 363-64, 753 P.2d 517. If the employer meets this burden, then the employee must show that the employer's stated reasons are pretextual and unworthy of belief. Hill, 144 Wash.2d at 182, 23 P.3d 440. The employee shows pretext if the proffered justifications have no basis in fact, are unreasonable grounds upon which to base the termination, or were not motivating factors in employment decisions for other similarly-situated employees. Kirby, 124 Wash.App. at 467, 98 P.3d 827; Chen, 86 Wash.App. at 190, 937 P.2d 612. An employee need not produce direct or "smoking gun" evidence to show pretext  circumstantial and inferential evidence can be sufficient  but an employee's subjective beliefs and assessments as to his performance are irrelevant. Hill, 144 Wash.2d at 190 n.14, 23 P.3d 440 ("[C]ourts must not be used as a forum for appealing lawful employment decisions simply because employees disagree with them."); Renz v. Spokane Eye Clinic, P.S., 114 Wash.App. 611, 623, 60 P.3d 106 (2002).
¶ 17 If the employee presents a prima facie case of employment discrimination and produces evidence demonstrating that the employer's asserted termination justifications are pretextual, the evidence will generally be sufficient to submit the discrimination question to a jury. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); Hill, 144 Wash.2d at 184-85, 23 P.3d 440. But even in this situation, an employer will still be entitled to judgment as a matter of law if no rational trier of fact could conclude that discrimination was a substantial factor in the employer's action. Reeves, 530 U.S. at 148, 120 S.Ct. 2097; Hill, 144 Wash.2d at 186-87, 23 P.3d 440; Domingo v. Boeing Employees' Credit Union, 124 Wash.App. 71, 78, 98 P.3d 1222 (2004).
For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.
Hill, 144 Wash.2d at 184-85, 23 P.3d 440 (quoting Reeves, 530 U.S. at 148, 120 S.Ct. 2097). The sufficiency of the employee's evidence, even with a prima facie case and proof of pretext, must be gauged on numerous factors, including the strength of the employee's prima facie case, the probative value of the proof discrediting the employer's explanations, and any other admissible evidence supporting the employer's case. Reeves, 530 U.S. at 148-49, 120 S.Ct. 2097; Hill, 144 Wash.2d at 186, 23 P.3d 440.
*1071 ¶ 18 Applying this law to the record before us, we conclude on two separate grounds that Schnitzer Steel and Robinovitz were entitled to judgment as a matter of law. First, Griffith failed to demonstrate that the justifications proffered for his termination were unworthy of belief. Second, the record, when viewed in its entirety, was insufficient for a rational trier of fact to find that Griffith's age or religion played a substantial factor in his termination.

THE JUSTIFICATIONS FOR GRIFFITH'S TERMINATION[6]
¶ 19 Schnitzer Steel was initially impressed with Griffith, promoting him to general manager and repeatedly complimenting his performance between 1995 and January 1998 as the facility made a profit of approximately $23 million. According to Schnitzer Steel, Griffith's performance declined to the point of necessitating a management change, when one of the facility's largest customers began lodging complaints, and the facility, even after major capital improvements, lost more than $5 million in 1998 and 1999.
¶ 20 Robinovitz testified that he decided, while putting together Griffith's annual performance evaluation in May 2000, to terminate Griffith's employment:
This was somebody that was going to take the No. 2 position. . . . [W]hen it came to the way we looked at a project, where we looked at an individual's performance, or what was risk to us and to the company, what responsibility we took for our actions and our decisions, . . . we had very, very, very clearly different ideas of what management responsibility and what a general manager had to do to make this plant run and how much risk we were willing to tolerate.
I have kind of a very low threshold for risk when it comes to my personal exposure and the company's, and the things that were important to me weren't important to [Griffith]. There was no place in this group, in this management group for me, under my direction, that I was going to . . . have confidence that when I wasn't there, he was watching my back.
9 RP (July 2, 2003) at 1590-91. According to Robinovitz, his conclusion was based on numerous practices Griffith had approved: avoiding overtime regulations by having employees paid in cash and without documentation; encouraging employees not to document work-related injuries; permitting the operation of an undocumented "company" store; purchasing asbestos-laden scrap metal; letting unprocessed scrap metal accumulate in the facility; and monthly operating costs routinely $300,000 to $400,000 greater than comparable Schnitzer Steel facilities. Robinovitz's lack of confidence was also attributed to Griffith's management style, which led to his ignorance of several questionable incidents: a customer's access to liquid oxygen without assistance or protective gear; the lack of disability parking for a disabled employee; undocumented loans to bankrupt customers; and a repair bill more than twice the value of the equipment being fixed.
¶ 21 Because Robinovitz and Schnitzer Steel presented numerous nondiscriminatory reasons for Griffith's termination, the burden shifted to Griffith to present evidence demonstrating that these reasons were unworthy of belief. Hill, 144 Wash.2d at 186, 23 P.3d 440. Griffith failed to do so.
*1072 ¶ 22 Griffith argues that the justifications for his discharge were pretextual because they were never documented. We agree with Griffith that an employer's lack of documentation for an employee's poor performance may be circumstantial evidence that the proffered discharge justifications were fabricated post hoc. But, by Griffith's own account, he and Robinovitz had repeated discussions during his employment about each of the issues Robinovitz and Schnitzer Steel would later cite as justifying Griffith's firing.
¶ 23 Nor did Griffith dispute that the facility he managed lost more than $5 million in 1998 and 1999. Instead, he now argues that this was an unreasonable basis upon which to base his termination because the losses were attributable to a downfall in the Asian scrap metal market and the installation of $15 million in improvements at the facility. But Griffith does not explain why the downturn in the Asian market caused losses in Tacoma when, undisputedly, other Schnitzer Steel facilities were able to maintain a profit. And, while losses might have been attributable in part to the facility's improvements, Griffith conceded that it was still reasonable for Schnitzer Steel to be concerned with multi-million dollar losses.
¶ 24 Griffith also argues that it was unfair to hold him responsible for certain cited policies which were practiced before his promotion to general manager. But this was also before Schnitzer Steel purchased the facility and, regardless of when the questionable policies were instituted, Griffith admitted that Robinovitz discontinued them when he took over as general manager. It is reasonable for an employer to be troubled by an employee who permits questionable policies to continue even if that employee did not initiate the policies.
¶ 25 Confusingly, Griffith also makes a blanket assertion that he should not be held accountable for incidents he was unaware of.[7] We find this position untenable. An employer may hold its management accountable for failing to keep abreast of matters it reasonably deems to be in the company's best interests.
¶ 26 By all accounts, Griffith's lack of awareness was attributable to his delegation style of management. This delegation management approach conflicted with Robinovitz's, which Griffith characterized as "micro-manag[ing]," "controlling every dollar expended," and "not to trust anybody." Br. of Resp't at 7. According to Robinovitz, it was the conflicting management philosophies which made it impossible for Griffith to serve as Robinovitz's "No. 2." We can discern no evidence demonstrating that this justification was unworthy of belief. Griffith, admitted that he disagreed with Robinovitz's desire to "put his initials on every nickel that [wa]s spent," and conceded that Robinovitz's management style was reasonable, had resulted in significant decreases to the facility's monthly operating budget, and was consistent with the disapproval Robinovitz expressed of the many questionable practices Griffith had allowed to occur on his watch. 5 RP (June 25, 2003) at 917.[8]
¶ 27 Moreover, Griffith does not deny that his lack of oversight left him unaware of a *1073 series of practices which exposed Schnitzer Steel to potential legal liability. Griffith's primary defense for these practices was that they were "one of many facets that sometimes you overlook in the normal routine of business." 6 RP (June 26, 2003) at 1076. But this conclusory opinion is insufficient to demonstrate that his management style was a pretextual reason for his termination; nor does it explain why, by Griffith's own admission, Robinovitz became aware of and addressed these problems within a year of taking over the position Griffith had held for four years. Robinovitz and Griffith had markedly dissimilar management styles that had led the Tacoma facility down very different paths. An employee has no cause of action for discriminatory termination where the employee fails to show that the employer's stated desire for a change in management philosophy was unfounded and pretextual.
¶ 28 Griffith did not succeed in raising an inference that the company's stated reasons for his termination were pretextual and unworthy of belief. The employer's justifications were either undisputed or challenged only with Griffith's irrelevant subjective assessments and opinions. Griffith failed to carry his burden in this regard and it was error for the trial court to submit this case to the jury.

SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE JURY'S VERDICT
¶ 29 As discussed below, we also conclude that the evidence presented was insufficient as a matter of law for a trier of fact to reasonably conclude that religious or age discrimination was a substantial factor in Griffith's termination. See Reeves, 530 U.S. at 148, 120 S.Ct. 2097; Hill, 144 Wash.2d at 184-85, 23 P.3d 440.
¶ 30 Schnitzer Steel and Robinovitz terminated Griffith's employment five years after promoting him to general manager. At the time of his initial promotion, the employer knew Griffith's age and his religious faith. When an employee is both promoted and fired by the same decisionmakers within a relatively short period of time, there is a strong inference that he or she was not fired due to any attribute the decisionmakers were aware of at the time of the promotion. Hill, 144 Wash.2d at 189, 23 P.3d 440; accord Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270-71 (9th Cir.1996) ("From the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.") (quoting Proud v. Stone, 945 F.2d 796, 797 (4th Cir.1991)).
Unless the strength of this inference is fully recognized, employers could be discouraged from hiring the very persons the Legislature intended the Law Against Discrimination to protect, fearful that doing so would make them more vulnerable, rather than less, to legal claims of unlawful discriminatory animus if legitimate business reasons later required discharging such a person.
Hill, 144 Wash.2d at 190 n.13. 23 P.3d 440. An employee under such circumstances cannot rely on simply presenting a prima facie case of discrimination and rebutting the justifications proffered for his termination. Hill, 144 Wash.2d at 188-89, 23 P.3d 440. To prevail, the employee must also present sufficient evidence "answer[ing] an obvious question: if the employer is opposed to employing persons with a certain attribute, why would the employer have [promoted] such a person in the first place?" Hill, 144 Wash.2d at 189-90, 23 P.3d 440.
¶ 31 Here, Griffith needed to present evidence answering this question to prevail. The underlying purpose of the Hill inference, commonly referred to as the same actor inference, does not impose overly narrow definitions to the requirements that the decisionmakers be the "same" or that the period of time be "short." As to the first condition, all that is required is that one of the decisionmakers involved in the promoting and firing be the same. Hill, 144 Wash.2d at 189 n.12, 23 P.3d 440. Thus, although Robinovitz was not involved in Griffith's promotion, because Leonard Schnitzer and Philip were, and because Griffith partially attributed his firing to them, this condition has been met. But as to the second condition that five years lapsed *1074 between the promotion and firing is not significant. While Hill involved only a period of eight months, several of the cases favorably cited in Hill as applying the same actor inference involved much longer time spans. Hill, 144 Wash.2d at 189 n. 12, 23 P.3d 440 (citing Brown v. CSC Logic, Inc., 82 F.3d 651 (5th Cir.1996) (four years); Buhrmaster v. Overnite Transp. Co., 61 F.3d 461 (6th Cir.1995) (at least five years); Tyndall v. Nat'l Educ. Ctrs., Inc., 31 F.3d 209, 214-15 (4th Cir.1994) (two years)). And, as the Sixth Circuit has stated:
[T]he length of time . . . affects the strength of the inference that discrimination was not a factor in the employee's discharge. Over the years, an individual may develop an animus towards a class of people that did not exist when the hiring decision was made. However, to say that time weakens the same actor inference is not to say that time destroys it. In discrimination cases where the employee's class does not change, it remains possible that an employer who has nothing against [the class] per se when it hires a certain [member] will have nothing against [the class] per se when it fires that [member], regardless of the number of years that pass. Thus, a short period of time is not an essential element of the same actor inference, at least in cases where the plaintiff's class does not change.
Buhrmaster, 61 F.3d at 464 (footnote omitted).[9]

EVIDENCE OF AGE DISCRIMINATION
¶ 32 The record is devoid of even an inference that Griffith's age was an issue with Schnitzer Steel and Robinovitz. Griffith recognized as much when he testified that he brought the age discrimination case because "I don't have anything I can lay a tangible hold on as to why I was released." 5 RP (June 25, 2003) at 848. This testimony is strikingly similar to that found insufficient in Grimwood, where the employee testified that he brought an age discrimination suit because "I don't feel I was given sufficiently good reason for my termination so I feel it has to be fundamentally another reason and that's all I can come up with." 110 Wash.2d at 361, 753 P.2d 517 (emphasis omitted). It is also similar to another case, discussed in Grimwood, in which the employee testified that age must have been the reason for his termination "because I could see no other reason." Simmons v. McGuffey Nursing Home, Inc., 619 F.2d 369, 371 (5th Cir.1980). In both cases, the appellate court affirmed summary judgment for the employer because the employee's own testimony highlighted the lack of any evidence to support an allegation of age discrimination. Simmons, 619 F.2d at 371; Grimwood, 110 Wash.2d at 361, 753 P.2d 517; see also Domingo, 124 Wash.App. at 85, 98 P.3d 1222 (affirming summary judgment for the employer where the employee wrote, "I believe I was only hit because of my sex or gender (as well as my nationality or age) because I cannot think of any other reason why I could have been hit").
¶ 33 The only evidence Griffith presented regarding his age discrimination claim was that his replacement was younger than he was. But Schnitzer Steel did not see his age as a problem in 1999 through 2000 when, in 1995, it made the decision to promote the then 52-year-old Griffith to general manager. See Lowe v. J.B. Hunt Transp., Inc., 963 F.2d 173, 175 (8th Cir.1992) ("It is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later."). Moreover, Griffith acknowledged that there were several members of Schnitzer Steel's management, including the general managers at other scrap metal facilities, who were close to Griffith's age or older. Robinovitz was in his 40s when Griffith was fired, and the record does not reflect that Griffith's age had proved problematic in any way. Nor is there evidence that Robinovitz or anyone else at *1075 Schnitzer Steel had made derogatory ageist comments or otherwise discriminated against older workers. On this record, the evidence was insufficient as a matter of law to support Griffith's age discrimination claim against Schnitzer Steel and Robinovitz.

EVIDENCE OF RELIGIOUS DISCRIMINATION
¶ 34 We turn then to Griffith's religious discrimination claim, which the trial court considered to be "a bit weaker" than the age discrimination claim. 7 RP (June 30, 2003) at 1115.[10] Griffith testified that he thought his Mormon faith was an issue because the scrap metal industry is controlled by the "Jews and Italians" and individuals who are Jewish "have a tendency to stick together." 5 RP (June 25, 2003) at 777. Griffith supported this allegation by citing Schnitzer Steel's management, which included several Jewish individuals. In addition, Griffith pointed to Neu's questioning of Griffith and the polygamy jokes told by the general manager of another Schnitzer Steel scrap metal facility. Griffith's "evidence" was either inadmissible or failed to rebut the Hill inference.
¶ 35 Neu's asking Griffith why he was running the Tacoma facility when he was not Jewish was not probative in explaining why Griffith was fired. Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, cannot satisfy the employee's burden of demonstrating animus. Bush v. Dictaphone Corp., 161 F.3d 363, 369 (6th Cir.1998) (citing Hopkins, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring)); Kirby, 124 Wash.App. at 467-68, 98 P.3d 827; see generally Brown, 82 F.3d at 655 (workplace comments are generally admissible only if they are proximate in time to the adverse employment action, made by a decisionmaker, relate to the employee's class, and relate to the adverse employment decision). By Griffith's own account, Neu was an employee of a competitor and neither Neu nor the competitor had control over Griffith's employment. As such, Neu's comment cannot be attributed to Schnitzer Steel.[11]
¶ 36 Likewise not imputable to Schnitzer Steel were the distasteful polygamy jokes told at company management functions by another general manager. Griffith does not assert that this individual was involved in the decision to demote and fire him. In fact, Griffith specifically testified that those individuals he believed to be the decisionmakers, Leonard Schnitzer, Philip, and Robinovitz, had never shown him any disrespect for his religious faith. And also telling is Griffith's admission that the jokes were a "total taboo" at Schnitzer Steel, contrary to company policy, and had been disavowed by the company's in-house counsel. 9 RP (July 2, 2003) at 1777. Griffith's own testimony conclusively established that the jokes were not attributable to the company or those who decided to terminate his employment.
¶ 37 Moreover, even if the jokes shed light on the work environment at Schnitzer Steel,[12] Griffith had to establish a nexus between the jokes and his employment by demonstrating that the jokes were probative of how Schnitzer Steel viewed Griffith as an employee. Rubinstein v. Adm'rs of Tulane Educ. Fund, 218 F.3d 392, 400-01 (5th Cir.2000); Kirby, 124 Wash.App. at 467 n.10, 98 P.3d 827. If workplace comments do not pertain to an individual's qualifications as an employee, they are "stray remarks" that have no bearing in a claim for employment discrimination. Compare Rubinstein, 218 F.3d at 400 (comments *1076 that an employee was a "Russian Yankee" and that Jews are thrifty were not probative as to why employee was denied tenure), with Reeves, 530 U.S. at 151, 120 S.Ct. 2097 (telling employee that he "was so old [he] must have come over on the Mayflower" and "was too damn old to do [his] job" constituted evidence of age discrimination) (alteration in original). Here, although the polygamy jokes were unquestionably inappropriate, they were not an indictment of Griffith's abilities to serve as a Schnitzer Steel employee. Thus, even if the jokes were probative as to Schnitzer Steel's work environment, they were not proof of Griffith's discriminatory firing claim.
¶ 38 The only "evidence" that remains is Griffith's belief that his faith was an issue because Schnitzer Steel's management was a microcosm of the scrap metal industry, an industry he asserted was controlled by a class of people, "Jews," who "stick together." 5 RP (June 25, 2003) at 777.[13] But this "assessment" does not explain why, if a Jewish-controlled company had problems with non-Jewish individuals in power, it installed a practicing Mormon as its general manager in 1995. Griffith has never asserted that the scrap metal industry or Schnitzer Steel's alleged intolerance became more pronounced in the years following his promotion, nor is there any evidence that Griffith's faith had proved to be an obstacle or source of concern for the company. As such, Griffith's evaluation of the scrap metal industry had no probative value.
¶ 39 Additionally, Griffith's own testimony undercuts his evaluation. Griffith conceded that Schnitzer Steel might have several members of management who were Jewish not because of their faith but because these individuals were part of Leonard Schnitzer's family. Griffith admitted that Schnitzer Steel had many non-Jewish individuals in management, including the general managers of several scrap metal facilities. In addition, Griffith acknowledged that from the time Schnitzer Steel bought the Tacoma facility until Robinovitz replaced him, there was only one member of the facility's management who was Jewish. Griffith testified that Robinovitz fired this individual shortly after Griffith for some of the same reasons given for Griffith's termination.
¶ 40 Griffith's testimony also strongly suggests that Schnitzer Steel had no animus toward him based on his faith. By Griffith's own account, Leonard Schnitzer and Philip encouraged him to continue teaching seminary classes even though it sometimes made him late to work. Griffith testified that Schnitzer Steel amended his health care plan to provide medical insurance for his son while he was on a Mormon-related mission. Griffith admitted that even after he was fired, his son and other Mormon employees continued to work at the Tacoma facility. Finally, Griffith testified that after his termination, he formed a scrap metal company which received favorable treatment from Schnitzer Steel; Robinovitz loaned Griffith equipment; and authorized the purchase of scrap metal from Griffith's fledgling company at a price near that given Schnitzer Steel's most favored customers. The record before us wholly fails to support Griffith's claim that Schnitzer Steel's termination decision was based on Griffith's religious faith.
¶ 41 Schnitzer Steel and Robinovitz presented numerous legitimate reasons for terminating Griffith's employment in 2000 and Griffith failed to show that these reasons were pretextual and unworthy of belief. Moreover, the evidence in this case was insufficient to support Griffith's claim that he was fired due to his age or religious faith. Schnitzer Steel and Robinovitz are entitled to judgment in their favor as a matter of law.
¶ 42 Reversed and remanded.
We concur: MORGAN and VAN DEREN, JJ.
NOTES
[1] 5 Report of Proceedings (RP) (June 25, 2003) at 777.
[2] We use the term "Mormon," rather than "Latter Day Saint," because this is the term Griffith uses in his briefing.
[3] The trial court admitted an interrogatory answered by Schnitzer Steel and Robinovitz that listed 23 different reasons for Griffith's discharge. Griffith has addressed several of these justifications in his briefing, but we discuss only those reasons that Schnitzer Steel and Robinovitz raise in their opening brief.
[4] In circumstances other than those presented here, an employee presenting direct evidence of discrimination may proceed under the analysis set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality), and Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 898 P.2d 284 (1995). This analysis requires only that an employee produce direct evidence that discriminatory animus was a substantial factor in the decision at issue, after which the burden of persuasion shifts to the employer, who must prove that it would have taken the same action regardless of discriminatory animus. Hopkins, 490 U.S. at 250-53, 109 S.Ct. 1775; Mackay, 127 Wash.2d at 309-10, 898 P.2d 284.
[5] In Kirby v. City of Tacoma, 124 Wash.App. 454, 466, 98 P.3d 827 (2004), we suggested that the replacement employee must be someone not in the protected class. Were this the case, Griffith's age discrimination claim would fail for neither he nor Robinovitz were outside the protected class. For support, Kirby correctly cited Brady v. Daily World, 105 Wash.2d 770, 777, 718 P.2d 785 (1986). But our Supreme Court has overruled Brady to require only that the employee be replaced by someone "significantly younger." Hill, 144 Wash.2d at 188 n. 10, 23 P.3d 440 ("The United States Supreme Court has ruled that replacement by someone outside the protected age group and `insignificantly younger' is not a proper element of a McDonnell Douglas prima facie case of age discrimination . . . . We agree.").
[6] For purposes of this appeal, we assume that Griffith presented a prima facie case of age and religious discrimination. Schnitzer Steel and Robinovitz maintain that Griffith failed to carry his burden in this regard because Griffith was not doing satisfactory work when he was fired. To that end, they cite the numerous acts they claim justified his firing. But whether an employee was performing adequately when the termination decision was made is a fact always disputed in a discrimination case; the employer's burden to present nondiscriminatory justifications for the firing necessarily requires it to dispute the "satisfactory performance" element of a prima facie case. The ultimate question for the fact-finder, assuming the employee has met the other elements of a prima facie case, is whether the employee was performing adequately when he was terminated: If the fact-finder rejects the employer's proffered justifications for the firing, it has generally concluded that the employee's performance was satisfactory; if it has accepted the justifications, it has necessarily concluded that performance was unsatisfactory. Because satisfactory performance is viewed in light of all the evidence presented, summary judgment for the employer on this basis will rarely, if ever, be appropriate.
[7] Although unaware of the incident, Griffith also argues that the cost to repair a company truck, a cost which was more than twice the truck's worth, was justified because Schnitzer Steel would not authorize the purchase of a new truck. We need not elaborate on why an employer may be reasonably concerned when its employees ignore or circumvent rejected purchase orders.
[8] Griffith asserts that operation of the "company" store and the undocumented pay tactic as a means of avoiding overtime pay were pretextual justifications because Robinovitz and Schnitzer Steel could cite to no law that these practices violated. But it is not relevant whether Robinovitz and Schnitzer Steel correctly believed these policies were unlawful; all that matters is whether their belief was genuine and reasonable. Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 166, 876 P.2d 435 (1994). Moreover, although Robinovitz and Schnitzer Steel did not cite to any of the laws which were implicated by these practices, we do. See, e.g., RCW 49.46.070 (requiring employer to maintain records of all hours worked by an employee); RCW 49.46.130 (requiring employer to pay employee at a rate at least one and a half times the employee's regular rate for hours in excess of 40 hours per week); RCW 82.08.020 (levying an excise tax on all "retail sales"); former RCW 82.24.020 (1994) (levying an excise tax on the sale of cigarettes); former RCW 82.24.500 (1986) (making it a misdemeanor to engage in the business of selling cigarettes without a license).
[9] As the Buhrmaster court noted, however, "in age discrimination cases, a short period of time may be required in order to infer a lack of discrimination. This is simply because the employees' classification changes over time  an employee hired at thirty is not the same employee fired at sixty." 61 F.3d at 464 n.2. We agree but conclude that the five-year period here, taking Griffith from 52 to 57 years of age, falls within the short period of time required.
[10] Schnitzer Steel contends that because the trial court dismissed the religious discrimination claim against Robinovitz, the trial court erred in not dismissing Schnitzer Steel as well. This argument would be correct if Schnitzer Steel was only vicariously liable for Robinovitz's actions. See Doremus v. Root, 23 Wash. 710, 716, 63 P. 572 (1901). But this argument fails because Griffith's theory was that Schnitzer Steel sent Robinovitz to Tacoma to fire Griffith because of its problem with his religion.
[11] We also question how Neu's comment could be probative as to Schnitzer Steel's motivations when Neu made the comment during a visit encouraged by Schnitzer Steel after Philip had shamed Neu by boasting of Griffith's exceptional performance.
[12] Kelley v. Airborne Freight Corp., 140 F.3d 335, 347 (1st Cir.1998) ("[S]tatements by nondecisionmakers can be evidence that a discriminatory atmosphere pervades the workplace and infects the company's personnel decisions.").
[13] Griffith's attorney maintained during oral argument before this court that Griffith's comments were not disparaging stereotypes but "facts." We find this assertion disconcerting, not only because it was made in a case involving allegations of discrimination, but because we believe that gross generalizations, especially those made on the basis of race, ethnicity, gender, religion, age, or sexual preference, are seldom, if ever, factual.