[No. 52982-0-I.   Division One.   September 7, 2004.]

LETICIA DOMINGO, *Appellant*, v. BOEING EMPLOYEES' CREDIT UNION, *Respondent*.

72

74

*John R. Dudley*, for appellant.

*Steven R. Peltin* (of *Preston Gates & Ellis, L.L.P.*), for respondent.

¶1 AGID, J. — Leticia Domingo appeals a trial court's decision granting summary judgment in favor of Boeing Employees' Credit Union (BECU), dismissing her claims that she was wrongfully terminated on the basis of her race, national origin, sex, and age, and in violation of public policy. Because she failed to raise an issue of material fact sufficient to survive summary judgment for each claim, we affirm.

## FACTS

¶2 Leticia Domingo began working for BECU in 1994 at age 52. In February 2001, BECU Director of Member Services Support Department, Melanie Walsh, received a complaint that Domingo was behaving violently toward her

coworkers. One coworker, Jackie Jackson, complained that Domingo had placed her hands around her neck in a choking manner. When Walsh investigated the incident, she got a written statement from Jackson and watched a security video of the incident that corroborated Jackson's story. Walsh also got a written statement from coworker Shannon Koehler who stated that Domingo hit and pinched her on several occasions. BECU issued a written warning that Domingo's behavior was inappropriate and violated BECU's policy prohibiting harassment and workplace violence.[1] The warning stated that if she violated the policy again, BECU would terminate her employment. Walsh met with Domingo to explain the warning, and Domingo said she understood the consequences of violating the policy again. Domingo declined to submit a written statement of her version of events.

¶3  At some other point during Domingo's employment,[2] she filed a complaint against coworker Vicki Gunns. Domingo alleged that Gunns hit her in a violent and offensive manner with the back of her chair. One of her supervisors, Maureen Morgan, investigated the complaint. After viewing the security videotape of the incident, she concluded the act was unintentional.

¶4  Several weeks after Domingo had received the written warning for acting violently toward Jackson, Koehler again complained about Domingo. She reported that Domingo had poked her with the sharp end of her pen. This complaint prompted a second investigation. Domingo denied that the episode took place. While the second investigation was pending, Koehler and Gunns reported that on two separate occasions Domingo made a threatening gesture by raising her arm with a closed fist as if she were going to strike them. Koehler stated she felt violated and was "always on [her] guard wondering if [Domingo] will do it again." Walsh never interviewed Domingo about the inci-

---

[1] Domingo had reviewed the policy and signed an acknowledgment that she read and understood it.

[2] The date is unclear from the record.

dent. After the second investigation confirmed Domingo's continuing violent behavior, BECU terminated her employment on April 10, 2001. Several coworkers later revealed that Domingo harassed, abused, and threatened them, and others admitted they witnessed the behavior.[3]

¶5 Domingo sued BECU under chapter 49.60 RCW, the Washington Law Against Discrimination (WLAD), alleging that she was wrongfully terminated on the basis of her race, national origin, sex, and age, and the termination violated public policy. She also claims BECU harassed her in violation of the WLAD. The trial court granted summary judgment in favor of BECU. Domingo appeals.

## ANALYSIS

■■ ¶6 In cases involving employment discrimination under the WLAD, Washington courts use the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*.[4] Under this framework, the plaintiff has the initial burden of proving a prima facie case. Once the plaintiff establishes a prima facie case, an inference of discrimination arises. In order to rebut this inference, the defendant must present evidence that the plaintiff was terminated for a legitimate reason. The plaintiff must then show that the proffered reason is a pretext for discrimination. The plaintiff has the final burden of persuading the trier of fact that discrimination was a substantial factor in the termination decision.[5] If a plaintiff cannot establish specific and material facts to support each element of the prima facie case,

---

[3] One coworker stated that Domingo often struck her on the back although she asked her to stop. Another said she saw Domingo striking and harassing coworkers. A third witnessed Domingo throwing objects and poking coworkers. She also said Domingo often appeared enraged, and she overheard her threaten that her brother would slash a coworker's tires. Domingo admitted that during a meeting at work, she yelled at a coworker and threatened that Domingo's family "[wouldn't] be happy about" the way the coworker was acting.

[4] 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[5] *Marquis v. City of Spokane*, 130 Wn.2d 97, 113, 922 P.2d 43 (1996).

the defendant is entitled to judgment as a matter of law.[6] If a plaintiff cannot present evidence that the defendant's reasons are untrue or mere pretext, summary judgment is proper. Even if both parties meet their requisite burdens, summary judgment is still proper if no rational trier of fact could conclude the action was discriminatory.

> "For instance, an employer would be entitled to judgment as a matter of law if the record *conclusively* revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was *abundant and uncontroverted* independent evidence that no discrimination had occurred. . . ."[7]

We review summary judgments de novo and conduct the same inquiry as the trial court,[8] considering all facts submitted and all reasonable inferences in the light most favorable to the nonmoving party.[9] But before we review the trial court's decision granting summary judgment, we must determine whether the trial court erred by considering an affidavit that Domingo claims violates Civil Rule 56(e).

## I. Melanie Walsh's Declaration

¶7 Domingo argues that the trial court erroneously considered her supervisor Melanie Walsh's declaration as evidence.[10] She claims that much of the affidavit is inadmis-

---

[6] *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 181, 23 P.3d 440 (2001).

[7] *Id.* at 184-85 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

[8] *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

[9] *Id.*

[10] Domingo asks this court to strike other witness testimony on the same basis. It is unclear which other affidavits/declarations she seeks to strike because she makes no specific reference to any witness affidavits/declarations other than Walsh's. She also fails to reference any other affidavit/declaration in her argument. *See State v. Despenza*, 38 Wn. App. 645, 648, 689 P.2d 87, *review denied*, 103 Wn.2d 1005 (1984) (The court does not need to consider assignments of error not supported by authority or argument.).

sible under CR 56(e)[11] because it contains hearsay references to videotape evidence that BECU was unable to produce at trial. We disagree for three reasons.

¶8 First, Walsh's description of what she saw on the videotape is not hearsay. Hearsay is an out-of-court statement offered for the truth of the matter asserted, and it is generally inadmissible absent an applicable exception.[12] In this case, Walsh's testimony was not offered for the truth of the matter asserted. Rather, it was offered to show Walsh's motivation for the decision to reprimand and eventually terminate Domingo's employment.[13]

¶9 Second, the videotape was unavailable and thus other evidence of its contents—in this case, Walsh's testimony about what it contained—is admissible under ER 1004. ER 1004 states that other evidence of the contents of a writing, recording, or photograph is admissible if the originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith. There is no evidence that BECU taped over the evidence in bad faith. Rather, the record suggests that they taped over it in the ordinary course of business.

¶10 Third, the authority Domingo cites to support her argument that CR 56(e) prohibits Walsh from testifying about a videotape that is not in the record does not stand for that proposition. In *Melville v. State*,[14] the court refused to consider an affidavit from the plaintiff's lawyer in which he asserted facts based on evidence that was not in the record. But in that case, the statements were not based on his personal knowledge and therefore did not comply with CR

[11] "CR 56(e) requires that affidavits submitted in summary judgment proceedings be made on personal knowledge and set forth such facts as would be admissible in evidence. The affiant must affirmatively show competence to testify to the matters stated." *Marks v. Benson*, 62 Wn. App. 178, 182, 813 P.2d 180, *review denied*, 118 Wn.2d 1001 (1991).

[12] ER 801(c), 802.

[13] *See* ER 803(a)(3) (An exception to the hearsay rule is a statement of the declarant's then existing state of mind, such as motive.).

[14] 115 Wn.2d 34, 793 P.2d 952 (1990).

56(e) requirements. In this case, Walsh viewed the videotapes herself. Therefore, her statements about what they contained are based on her personal knowledge and properly considered under CR 56(e).

■ ¶11 Because the trial court properly considered this affidavit, we also consider it when we review the trial court's decision dismissing Domingo's discrimination claims on summary judgment.

## II. Sex Discrimination

■ ¶12 To establish a prima facie sex discrimination case, a plaintiff must show that she: (1) is a member of a protected class, (2) was discharged, (3) was doing satisfactory work, and (4) was replaced by a person of the opposite sex or otherwise outside the protected group.[15] In any sex discrimination action based on disparate treatment, the plaintiff must demonstrate that she or he was treated differently from persons of the opposite sex who are otherwise similarly situated.[16] Domingo argues she has presented adequate evidence under both theories to survive summary judgment. We disagree for two reasons.

■ ¶13 First, although Domingo has shown she is a woman, was discharged, and was doing satisfactory work, she cannot show that she was replaced by a member outside the protected class, i.e., a man. We reject Domingo's argument that under *Kuest v. Regent Assisted Living, Inc.*,[17] she does not have the burden of showing she was replaced by a man because *Kuest* does not stand for that proposition. That case involved a pregnant woman who was replaced by a woman who was not pregnant. Accordingly, though not a man, her replacement was outside the protected class. In

---

[15] *Kuest v. Regent Assisted Living, Inc.*, 111 Wn. App. 36, 43-44, 43 P.3d 23 (2002), *review denied*, 149 Wn.2d 1023 (2003).

[16] *Marquis*, 130 Wn.2d at 113.

[17] 111 Wn. App. 36, 43-44, 43 P.3d 23 (2002), *review denied*, 149 Wn.2d 1023 (2003).

this case, Domingo was not replaced by a person outside of the protected class—in fact, she was replaced by a woman.

¶14 Second, Domingo's own declaration indicates she cannot demonstrate that she was treated differently from persons of the opposite sex who are otherwise similarly situated. Although she states she believes she was treated differently from others based on her gender, her own declaration suggests that is not true. Domingo states, "No other *man or woman* that I am aware of made a complaint about being hit by a co-worker at BECU and had this complaint dismissed"[18] and "[n]o other *man or woman* that I am aware of was dismissed by BECU on trumped up charges of violence."[19] Because Domingo presents no evidence that she was treated differently from a similarly situated man, summary judgment on Domingo's disparate treatment claim was proper.

## III. National Origin and Race Discrimination

¶15 To establish a prima facie case of racial discrimination based on disparate treatment, a plaintiff must show that his or her employer treats some people less favorably than others because of his/her race.[20] The plaintiff must show (1) she belongs to a protected class, (2) she was treated less favorably in the terms or conditions of her employment than a similarly situated, nonprotected employee, and (3) she and the nonprotected "comparator" were doing substantially the same work.[21]

¶16 Domingo belongs to a protected class—her national origin is Filipino and her race is Asian. She states that she was treated differently from the Caucasian women at BECU in three ways. First, she asserts she was treated unfavorably as a Filipino because management told her she

---

[18] (Emphasis added.)

[19] (Emphasis added.)

[20] *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 226-27, 907 P.2d 1223 (1996).

[21] *Id.*

could not speak her native language with her Filipino coworkers. Second, she contends Caucasian employees were treated less harshly than she with regard to violent behavior. Third, she notes that when she complained that a Caucasian woman, Gunns, struck her at work with her chair, her Caucasian supervisors dismissed her claim after interviewing both employees; but when two Caucasian coworkers complained that Domingo engaged in violent behavior toward them, her Caucasian supervisors interviewed the coworkers but did not interview Domingo. BECU argues that Domingo's assertions are speculative. Also it asserts that Domingo's evidence does not show that management's decision to terminate Domingo, rather than her Caucasian coworkers, was pretext because the violence alleged in both situations is not comparable. We agree with BECU.

¶17 First, Domingo has offered no evidence that similarly situated coworkers were allowed to speak their native languages. BECU offered evidence that when employees spoke languages other than English during working hours, some were uncomfortable.[22] In an effort to maintain employee morale, it implemented an English-only policy during work hours under its effective communication requirement in the item processing representative job description.[23] There is no evidence in the record suggesting that BECU failed to apply this guideline consistently to all employees.

¶18 Second, Domingo has not presented a prima facie case concerning her allegation that Caucasian coworkers accused of violent conduct were treated less harshly than she. The situations she testified to are not comparable. There are only two other allegations of violence in the record made against employees other than Domingo. In

---

[22] BECU employees told management that it made them uncomfortable because they could not participate in the conversation and did not know if the employees speaking another language were gossiping about them.

[23] Courts have upheld such language policies. *See Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1487 (9th Cir. 1993), *cert. denied*, 512 U.S. 1228 (1994). Domingo admitted that she believed the policy was legitimate.

1999, Domingo complained that Gunns hit her with the back of her chair. BECU supervisor Morgan investigated the complaint and concluded that based on security video that captured the incident, Gunns did not know that Domingo was behind her and there was nothing to suggest the act was intentional. The second incident involved two Caucasian women—one supervisor and one employee. The supervisor allegedly chased the employee around the office and then punched and pinched the employee on the arm. Domingo presents no evidence that a complaint was filed against the supervisor or employee, the incident was not consensual horseplay, or that no action was taken. Because the allegations against Domingo were more serious than those in these two situations, the coworkers here are not "comparators" for purposes of proving disparate treatment.[24]

¶19 Third, Domingo argues she was treated less favorably during BECU's investigations than her Caucasian coworkers, Jackson and Gunns, because when she complained about Gunns hitting her with the chair, BECU interviewed both her and Gunns but when Jackson and Koehler complained about Domingo, management interviewed only Jackson and Koehler. But again, the situations are not comparable. Domingo's allegation against Gunns involved a situation where the action may have been inadvertent.[25] The allegations against Domingo involved intentional acts, such as placing hands around the neck of a coworker and shaking them or raising a closed fist threatening to hit a coworker. Walsh's declaration supports this distinction: she states that she did not interview

---

[24] See Roeber v. Dowty Aerospace Yakima, 116 Wn. App. 127, 138, 64 P.3d 691, review denied, 150 Wn.2d 1016 (2003) (In a disparate treatment disability case, the court rejected plaintiff's arguments that other employees who demonstrated threatening behavior were treated more favorably because the other coworkers' alleged violence was less serious and not comparable.).

[25] Morgan stated that it was clear from the videotape that Domingo approached Gunns from behind to deliver some work, and Gunns did not see her. There were several loud pieces of equipment so Gunn likely did not hear Domingo coming. When Gunns turned her chair around to change work places, she inadvertently bumped Domingo.

Domingo about the choking incident because the security videotape showed that the incident took place and after seeing the tape, she did not feel an interview was necessary.[26] And although she did not interview Domingo, she gave Domingo an opportunity to provide a written statement of her version of events when she issued the written warning, but Domingo declined. In addition, Domingo offers no evidence that the investigations were different because of race or national origin. The mere fact that Domingo's coworkers and supervisors are of a different race is insufficient to show discrimination.[27] And she offers no evidence that her supervisors or coworkers made derogatory statements about her race or national origin, or otherwise treated her unfavorably because of her ethnicity. Summary judgment on this claim was proper.

## IV. Hostile Work Environment

¶20 To demonstrate a hostile work environment claim, a plaintiff must prove that the harassment (1) was unwelcome, (2) was because she is a member of a protected class, (3) affected the terms or conditions of employment, and (4) is imputable to the employer.[28] Domingo claims that Gunns' act of hitting her with the back of her chair created a hostile work environment. We disagree.

¶21 Although Domingo belongs to a protected class and assuming she can show that Gunns' actions constitute harassment, she does not provide any evidence that Gunns hit her with her chair because of her gender, age, or race. In

---

[26] *See also Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (courts generally do not second guess the wisdom of personnel decisions because "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *'right'* but whether the employer's description of its reasons is *honest.'* ") (citation omitted) (quoting *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)).

[27] *See Gill v. Reorganized Sch. Dist. R-6*, 32 F.3d 376, 379 (8th Cir. 1994) (The mere fact that the employer knew the employees' race before making a termination decision is proof of neither pretext nor discriminatory intent.).

[28] *Robel v. Roundup Corp.*, 148 Wn.2d 35, 44-45, 59 P.3d 611 (2002) (citing *Glasgow v. Georgia-Pac. Corp.*, 103 Wn.2d 401, 406-07, 693 P.2d 708 (1985)).

fact, she admits she does not know the reason why Gunns hit her: she stated, "I believe I was only hit because of my sex or gender (as well as my nationality or age) *because I cannot think of any other reason why I could have been hit.* In other words, I feel that I must have been hit for one of these reasons."[29] This speculative statement is not enough to survive summary judgment.[30] In addition, Domingo fails to show that Gunns' actions were severe enough to affect the terms of her employment,[31] were part of a pattern of harassment, or that the harassment was imputed to BECU.[32] Accordingly, summary judgment was proper.

## V. Public Policy

¶22 Absent a contract or narrow exception, employers in Washington are free to terminate an employee at will.[33] An exception exists where the discharge violates a clear mandate of public policy.[34] A plaintiff alleging that a discharge violates public policy must prove (1) the existence of a clear public policy, (2) that discouraging the conduct in which they engaged would jeopardize the public policy, and (3) that the conduct linked to the public policy caused the

---

[29] (Emphasis added.)

[30] *See Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988) (Ultimate facts, conclusions of fact, and conclusory statements are insufficient to defeat a summary judgment motion.).

[31] *Glasgow*, 103 Wn.2d at 406 ("Casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law. [Rather] [t]he harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment.").

[32] Domingo offers no evidence that BECU did not take prompt and appropriate action. *See id.* (Chapter 49.60 RCW does not impose a duty on the employer to maintain a pristine working environment. It imposes a duty on the employer to take prompt and appropriate action when it knows or should know of coemployees' conduct in the workplace amounting to sexual harassment.).

[33] *Selix v. Boeing Co.*, 82 Wn. App. 736, 740, 919 P.2d 620 (1996), *review denied*, 130 Wn.2d 1024 (1997).

[34] *Dicomes v. State*, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989).

dismissal.[35] In addition, the defendant must not be able to offer an overriding justification for the dismissal.[36] In her complaint, Domingo alleged that her "termination violated the public policy exception to the terminable at will doctrine by relying on false and defamatory statements and, in turn, using such false and defamatory statements to terminate the plaintiff." On appeal, Domingo abandons this theory, conceding that no public policy prohibits this behavior. Although Domingo argues a new theory on appeal, it was never presented to the trial court. An appellate court will consider only evidence and issues called to the attention of the trial court when reviewing a trial court's decision to grant summary judgment.[37] Accordingly, we refuse to consider Domingo's public policy argument and affirm the trial court's decision to grant summary judgment on that claim.[38]

## VI. Age Discrimination

¶23 Domingo contends that she presented evidence establishing an issue of material fact making summary judgment on her age discrimination claim improper. BECU argues that Domingo has not made a prima facie case nor has she shown that BECU's reasons for firing her were a pretext for discrimination. Although we conclude that Domingo made a prima facie case, we agree with BECU that she did not provide evidence of pretext sufficient to survive summary judgment.

¶24 To establish a prima facie age discrimination case, a plaintiff must show that she was (1) within the statutorily protected age group; (2) discharged; (3) doing

---

[35] *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996).

[36] *Id.*

[37] RAP 9.12; *Youngblood v. Schireman*, 53 Wn. App. 95, 99, 765 P.2d 1312 (1988).

[38] Even if we considered the new theory, summary judgment was proper. Domingo has not presented any specific law or public policy prohibiting retaliation or presented evidence that management treated her differently after she complained about Gunns. In addition, BECU has shown an overriding justification for termination.

satisfactory work; and (4) replaced by a younger person.[39] BECU does not dispute that Domingo has shown she is a member of a protected class,[40] was discharged, and was doing satisfactory work, but they argue that there is no evidence in the record that BECU replaced her with a younger worker. BECU claims that Domingo's own assertions that her replacement was younger are not sufficient because they are unsubstantiated and outside her personal knowledge.[41] While that may be true, Domingo submitted a declaration from coworker Robie Rose Nguyen in which she recalled that Domingo was replaced by one or two people, both of whom were between 25 and 30 years old.[42] This is sufficient evidence to meet Domingo's burden of coming forward with a prima facie case.[43]

¶25 However, we agree with BECU that Domingo has not provided any evidence to show that BECU's stated reasons for terminating her are unworthy of belief or mere pretext. In this case, BECU presented several declarations and internal memoranda articulating legitimate, nondiscriminatory reasons for terminating Domingo, specifically that she violated the company's policy against workplace harassment and violence. Violent or harassing behavior is a legitimate reason for termination.[44] This meets BECU's burden of production because an employer

---

[39] *Grimwood*, 110 Wn.2d at 362.

[40] When an employer discharges an employee between the ages of 40 and 70 because of age, it engages in an unfair practice and becomes liable for damages and reasonable attorney's fees. *Carle v. McChord Credit Union*, 65 Wn. App. 93, 97, 827 P.2d 1070 (1992). Domingo was 58 years of age when she was terminated.

[41] A nonmoving party may not rely on speculation or on having its affidavits considered at face value. See *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

[42] Although BECU moved to strike many portions of Nguyen's declaration, it did not move to strike this portion.

[43] BECU argues that to present a prima facie case, Domingo must also show that BECU treated similarly situated younger workers more favorably. However, this evidence need not be presented to prove her prima facie case. Rather, it *may* be presented to show pretext. See *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 668, 880 P.2d 988 (1994), *cert. denied*, 513 U.S. 1112 (1995).

[44] *See Roeber*, 116 Wn. App. at 137.

need only articulate reasons sufficient to meet the prima facie case.[45] Accordingly, the burden shifts to Domingo to show BECU's stated reason is a pretext for discrimination. An employee cannot create a pretext issue without some evidence that the employer's reasons for termination are unworthy of belief.[46] An employee can demonstrate that the employer's proffered reasons are unworthy of belief with evidence that: (1) the employer's reasons have no basis in fact; or (2) even if the reasons are based on fact, the employer was not motivated by the reasons; or (3) the reasons are insufficient to motivate the adverse employment decision.[47] A plaintiff may also demonstrate pretext or discriminatory intent by showing disparate treatment, i.e., she was treated differently from similarly situated employees outside the protected class.[48]

¶26 Domingo offers the following evidence to show that BECU's reasons are mere pretext. First, she denies that she ever engaged in violent behavior. But under *Gill v. Reorganized School District R-6*,[49] this assertion alone is insufficient to raise an issue of fact. In *Gill*, the plaintiff, a substitute teacher, claimed she was terminated on the basis of race. A student had complained that Gill had used a racial epithet, but Gill denied the accusation. Nonetheless, the school superintendent removed the plaintiff as a substitute teacher after the assistant principal investigated the incident. The court rejected the plaintiff's argument that her denial was sufficient to raise an issue of fact. It stated,

> Whether Gill did or did not engage in the conduct reported to the superintendent and whether the superintendent should

---

[45] *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360 n.46, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).

[46] *Kuyper v. Dep't of Wildlife*, 79 Wn. App. 732, 738, 904 P.2d 793 (1995), *review denied*, 129 Wn.2d 1011 (1996).

[47] *Chen v. State*, 86 Wn. App. 183, 190, 937 P.2d 612, *review denied*, 133 Wn.2d 1020 (1997).

[48] *Hume*, 124 Wn.2d at 668.

[49] 32 F.3d 376 (8th Cir. 1994).

have relied on the assistant principal's investigation are "irrelevant because [this evidence] merely questions the soundness of the [superintendent's decision]." Incorrect thinking on the superintendent's part does not prove the school district's explanation is a pretext.[50]

In this case, Domingo does not dispute that coworkers complained about her conduct, that Walsh investigated the complaints, or that she received a written warning about her violent behavior. Rather, she complains that management did not listen to her side of the story. But she presents no evidence that Walsh did not, in good faith, believe that Domingo engaged in violent conduct.

¶27 Second, Domingo points to several conversations where her supervisors and coworkers mentioned her advancing age. One conversation was between Domingo and BECU supervisor Morgan in January 1995, during which Morgan allegedly said she would not have hired Domingo if she had known her age. Domingo also relies on a second conversation that Nguyen had with Gunns, Jackson, and Barbara Robertson. Nguyen stated in her declaration that Gunns and Jackson said Domingo "should have been gone a long time ago because she is old and slow, that she might have a medical problem and that she might be crazy."[51] And there was a third conversation between Domingo and Walsh in January 2001, where Walsh said Domingo was "no longer a spring chicken." Assuming these remarks were made, they are insufficient to establish pretext or discriminatory intent.

¶28 Morgan's remark is insufficient because there is no indication that it was connected to Domingo's termination. Not only did Morgan make the remark six years before Domingo was fired, but Morgan also was not involved in the decision to fire her. Generally, age-related

---

[50] *Id.* at 379 (alterations in original) (citations omitted).

[51] Although BECU moved to strike many portions of Nguyen's declaration, it did not move to strike this portion. BECU also asks this court to strike portions of the Sy Su, Nguyen, and Domingo declarations. Because Domingo's claims do not survive summary judgment even with the testimony, we need not address the issue.

comments by nondecision makers are not material in showing an employer's decision was based on age discrimination.[52] Coworkers Gunns' and Jackson's remarks are insufficient for the same reason. Walsh's remark is not so easily dismissed because she was involved in the decision to terminate Domingo. There is no evidence in the record, however, about the context or manner in which Walsh made the remark, except that she made the comment three months before Domingo was fired in a late afternoon meeting that Domingo scheduled to discuss her relationship with her coworkers. Without evidence about the context of the remark, it is impossible to know whether it is related to Domingo's termination, whether Walsh innocently made the comment in an unrelated context, or said it as a joke. Domingo has not demonstrated that the comment was anything but an isolated, stray remark.[53] Even if the comment were seen as circumstantial evidence of age discrimination, it creates such a weak issue of fact that no rational trier of fact could conclude that BECU fired Domingo because of her age. This is particularly so in light of the uncontroverted, overwhelming evidence in the record that Domingo engaged in violent behavior and had difficulty working with coworkers throughout her six year employment term. For example, BECU offered declarations from four coworkers who stated that they personally experienced and/or witnessed Domingo engaging in violent behavior at work.[54] It also submitted declarations from two supervisors detailing complaints they received from coworkers about Domingo's behavior and described the vio-

---

[52] *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).

[53] *See Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1044-45 (7th Cir. 2000) (Employer's statement that plaintiff was " 'getting critical in [his] old age' " does not show pretext because "[a]lthough remarks can occasionally help to establish pretext . . . pretext is not demonstrated by isolated statements unrelated to the employment decision at issue."); *see also Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918-19 (9th Cir. 1996) (employer's reference to "old timers" was not tied directly to plaintiff's layoff, was very weak evidence of pretext, and was not enough to create an inference of age discrimination), *cert. denied*, 522 U.S. 950 (1997).

[54] Decl. of Cristina Collado; Decl. of Shannon Koehler; Decl. of Mary Higashi; Decl. of Dwiwati.

lent behavior they saw on the security videotapes. It also offered e-mails and correspondence showing that BECU conducted an investigation and other materials on which it based its decision. And finally, it offered Domingo's performance evaluations from 1995 through 2001. These evaluations consistently suggest that since she began working at BECU, Domingo faced challenges working with her coworkers due to miscommunications and misperceptions that often ended in conflict.[55] In light of this uncontroverted evidence of persistent behavioral problems and Domingo's weak showing of pretext, we affirm the trial court's decision granting summary judgment.

## VII. Attorney Fees

¶29 BECU requests attorney fees on appeal under RAP 18.9, which permits this court to award fees when an appeal is frivolous. Because we cannot say that Domingo has raised no debatable issues upon which reasonable minds could differ, we do not award attorney fees in this case.

¶30 We affirm.

ELLINGTON, A.C.J., and BAKER, J., concur.

---

[55] Performance evaluation 1995 (recommending that Domingo attend a communication class to allow her to resolve "issues" on her own, without conflict); performance evaluation 1997 (Domingo showed improvement, but will continue to work with her supervisor to improve misperceptions and conflict with her coworkers); performance evaluation June 1998 (Domingo is challenged in handling work-related issues with her coworkers); performance evaluation December 1998 (Domingo experienced confrontations with coworkers); performance evaluation June 1999 (encouraging Domingo to "develop her ability to handle work related issues, while separating personal issues, with coworkers by choosing the best approach for resolution"); performance evaluation December 1999 (Domingo needs to develop communication skills); performance evaluation June 2000 (Domingo required counseling to improve her communication skills, and she told her supervisor that she needed to stay silent to avoid conflict); performance evaluation December 2001 (Domingo was working on building better relationships with coworkers and encouraging her to remain calm, be approachable, and communicate positively).