IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ABUBACARR WAGGEH, | ) | No. 79876-6-I |
| | ) | |
| Appellant/Cross-Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| THE STATE OF WASHINGTON | ) | |
| DEPARTMENT OF CORRECTIONS, | ) | |
| and MIKE OBENLAND, and DANIEL | ) | |
| W. WHITE, SUPERINTENDENT OF | ) | |
| SPECIAL OFFENDER | ) | |
| UNIT/INTENSIVE MANAGEMENT | ) | |
| UNIT, | ) | |
| | ) | |
| Respondents/Cross-Appellants. | ) | |
| | ) | |

HAZELRIGG, J. — Abubacarr Waggeh seeks review of summary judgment for his former employer, the State of Washington Department of Corrections (DOC), on his claims of discrimination and retaliation under the Washington Law Against Discrimination.[1] He also argues that the trial court erred in striking evidence of a settlement offer that DOC made to him in an effort to resolve a grievance filed by Waggeh and his union. DOC cross-appeals, arguing that the court erred in denying its motion to strike evidence submitted by Waggeh that was inadmissible or related to events outside the statute of limitations.

---

[1] Chap. 49.60, RCW.

Citations and pinpoint citations are based on the Westlaw online version of the cited material.

Waggeh failed to demonstrate a genuine issue of material fact on his claims because he did not satisfy his burden to show that DOC's articulated legitimate reason for his termination was a pretext for discriminatory or retaliatory intent. The court did not err in striking evidence of a settlement offer that was submitted as proof of liability. We affirm.[2]

FACTS

Abubacarr Waggeh began working for the Department of Corrections (DOC) in January 2008. He was employed as a corrections officer at the Monroe Correctional Complex (MCC) for nearly eight years and primarily worked in the visit room at the facility. DOC investigated Waggeh for allegations of misconduct and inappropriate conduct with visitor and offenders under DOC supervision. In July 2015, Waggeh filed a complaint with the Equal Employment Opportunity Commission (EEOC) and filed an amended complaint on September 21, 2015. Waggeh was fired in October 2015. The EEOC issued a right to sue letter on February 11, 2016.

Waggeh filed suit against DOC and two superintendents at the facility raising claims of wrongful termination, retaliation, harassment and hostile work environment, discrimination, defamation, and breach of the duty of good faith and fair dealing. DOC moved for summary judgment on all claims. In support of its motion, it filed a declaration of Sherry Lucas, a human resources consultant employed by DOC at the MCC. The Lucas declaration attached copies of DOC

---

[2] In light of this result, we need not address DOC's cross-appeal because any error made by the trial court in considering inadmissible evidence was necessarily harmless.

policies and Waggeh's personnel records, including incident reports, investigation records, and discipline records. DOC also filed a declaration of counsel with excerpts from Waggeh's deposition testimony. The declarations and attached exhibits established the following facts.

DOC maintains numerous policies and trains its employees on their rights and obligations under those policies. DOC has a zero tolerance policy for all forms of sexual misconduct, and sanctions for such misconduct may include dismissal. DOC "does not recognize consensual sexual contact between staff and offenders as a defense against allegations of sexual misconduct." Under the Prison Rape Elimination Act (PREA), staff sexual misconduct includes engaging in sexual intercourse with an offender and

> Engaging in any of the following acts for the purpose of gratifying the sexual desire(s) of any person or getting an offender to engage in staff sexual misconduct, or when the act has sexual undertones (i.e., can reasonably be inferred to be sexual in nature, judged according to a reasonable person's reaction to a similar act under similar circumstances):
> . . . .
> c. Exchanging personal letters, pictures, phone calls, or contact information with an individual known to be under Department jurisdiction or the immediate family of an individual known to be under Department jurisdiction unless expressly authorized by the Secretary/designee.
> d. Exchanging personal information with an individual known to be under Department jurisdiction, or his/her immediate family, intended to abuse, humiliate, harass, degrade, or arouse any person and/or in an effort to get an offender to engage in staff sexual misconduct.

All allegations of staff sexual misconduct are investigated.

Employees are to receive initial PREA training when hired and annual refresher training. When Waggeh was hired, he acknowledged receipt of and

- 3 -

agreed to familiarize himself with the collective bargaining agreement, the DOC employee handbook, and DOC policies concerning employee relationships/contacts with offenders, drugs and alcohol, and the PREA. Waggeh admitted he had been trained on these policies and knew the expectations for behavior.

The first indications of problematic behavior appeared in Waggeh's annual performance review for the period from January 2010 to January 2011. The authoring sergeant noted a number of incidents that had occurred throughout the preceding year. The evaluation recounted reports that Waggeh had taken a state van off the premises, behaved unprofessionally and inappropriately by knuckle bumping an offender, idled at his post and failed to patrol the visiting room or pat-down offenders when they arrived, made inappropriate comments to female visitors, refused to be relieved by a female officer, spent too much time conversing with offenders when he should have been performing his duties, "soft-lock[ed]"[3] the offender visiting room entrance, and responded to a reminder never to soft-lock a door by saying, "Yeah, whatever." Despite these reports, the sergeant noted that "most of the issues have been resolved" and he believed that "Officer Waggeh has the ability and intelligence to turn himself around and become an asset to the Department."

DOC investigated an incident in November 2010 in which Waggeh allegedly ignored directives given by a sergeant to secure the door of the visiting room, hung up the phone on the sergeant, and yelled at him in the administration building. This

---

[3] The term "soft-lock" is used in correctional institutions to refer to closing an automatically-locking door softly enough that it does not latch and the lock does not engage.

behavior was witnessed by staff, visitors, and offenders. The investigator concluded that Waggeh's actions were insubordinate, unprofessional, and disrespectful toward other staff members. Waggeh was issued a letter of reprimand from the superintendent of the facility.

In August 2011, DOC received a tip that Waggeh was bringing drugs into the facility. Waggeh agreed to a search of his person and vehicle. A drug-sniffing dog alerted to his pants pocket, his utility belt, and the center console of his vehicle, but no drugs were found. DOC required Waggeh to submit to a drug test because the dog had alerted and "his eyes were very red." Waggeh agreed to testing. After the test, a superintendent explained to Waggeh that he would not be allowed to leave the testing site in his own vehicle because they could not be sure that he was not driving under the influence before the test results were obtained. Waggeh was offered transportation to his residence but, despite the warning, left in his personal vehicle, and 911 was called. The drug test returned negative results. Incident reports noted that Waggeh was cooperative with the investigation but could not explain why the dog alerted.

In February 2012, a sergeant wrote an incident report after noticing Waggeh "standing around not doing anything" when he should have been preparing the visitor room. Although Waggeh had 20 minutes to prepare the room, he had not done so by the time the visitors arrived. The next week, another sergeant identified several concerns with Waggeh, including leaving his post, failing to properly communicate about offender movements in the facility, and being "late quite frequently." Two months later, Waggeh informed DOC that his driver's license had

been suspended due to unpaid tickets. He was allowed to continue working provided he did not operate state vehicles until his license was reinstated.

In September 2012, a corrections officer filed an incident report after encountering a former inmate's wife while off duty. He said that she had asked him about Waggeh and remarked that "he was always trying to get her to go to a club in Seattle where he always went to." The officer noted that another inmate's wife had told him something similar about three years before, but he had not credited the statement. Even so, he had spoken to Waggeh after this first report and "told him that the worst thing he could do in visiting was to be hitting on the vis[i]tors and that he could have nothing at all to do with them." The officer also noted another rumor that had been circulating about two years before that an inmate porter's girlfriend was hanging out with Waggeh at the same bar.

In October 2012, a sergeant wrote an incident report describing his interaction with Waggeh when briefing him on the logistics plan for an event. Waggeh argued with him about the logistics and disregarded what the sergeant told him and showed him in the plan. The same day, another sergeant wrote an incident report detailing allegations made to him by an offender that Waggeh had made advances toward the offender's wife when she came to visit and made comments to her that made her uncomfortable. The offender stated that his wife refused to come back to visit as long as Waggeh was there. The sergeant contacted the offender's wife and she confirmed that Waggeh had said things that made her uncomfortable and made passes at her while she was waiting for her husband.

After an investigation of two incidents that occurred in October 2014, Waggeh was issued another letter of reprimand in February 2015. The investigator found that Waggeh had allowed an offender's female visitor to use his personal cell phone for 10 to 15 minutes in the facility's parking lot and texts from Waggeh's phone number were found on the visitor's phone. The investigator also found that, on a separate occasion, Waggeh had taken a female visitor to the back storage area, alone behind a closed door at the facility, and cut the hood off of her jacket because hoods are not allowed in the visit room. The letter stated that these actions violated DOC policies requiring courteous and professional treatment of visitors, prohibiting communications with offenders or their associates, and directing employees to avoid situations that present the appearance of impropriety. The superintendent who issued the letter noted that he was "very concerned about [Waggeh's] judgment and ability to assess and address situations appropriately that occur with visitors and/or offenders during times of visiting." After reiterating the responsibilities of a visit room staff member, the superintendent stated:

> You have severely damaged my faith in your ability to meet these visit room requirements. This disciplinary action is intended to impress upon you the gravity of your misconduct. I take this incident seriously and will not tolerate any disregard for the directives given to you above or by the Department in the future. Any further misconduct on your part may result in further disciplinary action, up to and including discharge.

Waggeh was permanently reassigned from the visit room position to another position in the facility.

In early 2015, DOC began investigating allegations that Waggeh had exchanged telephone numbers and gone out partying with Autumn Arnestad, a

woman he had met when she was visiting an offender; made inappropriate comments of a sexual nature to three different women visiting inmates; made threatening comments to an offender who had reported Waggeh's conduct; and retaliated against one of the women who had refused his sexual advances by denying her access to visitation. On March 16, 2015, the investigation was reassigned to investigator Michelle Torstvet at DOC's Workplace Investigation Services Unit because of the complexity and scope of the allegations. During the course of the investigation, Torstvet received a report that Waggeh had gone on a date and had sexual contact with a woman who was under DOC supervision, Mandi Gregg. DOC opened a separate investigation regarding this allegation on May 4, 2015.

Waggeh was interviewed in connection with both investigations and denied all of the allegations. He stated he did not recognize photos of any of the women involved except for one of the women who had reported his inappropriate comments, saying that her face was familiar to him as a regular visitor. DOC sent Waggeh a notification of potential disciplinary action on July 28, 2015 and attached copies of Torstvet's investigation reports. The letter informed Waggeh that DOC was "considering taking disciplinary action against [him], up to and including discharge." Waggeh was given an opportunity to respond in writing or in person at a pre-disciplinary meeting scheduled for August 3, 2015.

In August 2015, Waggeh was disciplined for a separate incident, resulting in a five percent pay reduction for three months. Another corrections officer and a nurse reported that Waggeh appeared to be asleep while guarding an inmate at

Harborview Medical Center. The nurse stated that she was not sure if Waggeh was asleep, but his eyes were closed during the ten minutes she was in the room as if he did not know she was there. The officer reported that she had to call Waggeh's name three times to wake him. Waggeh denied sleeping on duty, said that the other officer was lying, and said that the nurse would not have been able to tell if his eyes were closed because "[i]t's a big, dark room. I'm a black person. She would have to be closer to see."

In the notification of disciplinary action, the superintendent noted: "You have taken no responsibility for your behavior nor have you shown any remorse. You have caused significant harm to your credibility and the public we serve. You have embarrassed the Department. Your behavior has severely diminished my trust in you to honestly and effectively perform your duties." The superintendent wrote that Waggeh was expected "to demonstrate honesty, reliability, and trustworthiness" and warned him "in the strongest terms possible that any further misconduct on your part will result in further disciplinary action, up to and including dismissal."

Waggeh's employment was terminated on October 19, 2015. The notice of disciplinary action stated that there were three reasons for Waggeh's discharge: he engaged in an off-duty sexual relationship with an offender on DOC community supervision, he exchanged phone numbers and went out for drinks with a woman he had met while she was visiting an offender at the facility, and he failed to report his personal communications and relationships with known associates of an offender. The superintendent made findings after the full investigations and pre-

disciplinary meeting at which Waggeh had the opportunity to present any additional evidence. The letter listed the following findings:

> I have found that you did have sexual relations with Ms. Gregg, an offender on DOC supervision at the time. She had nothing to gain by answering the investigator's questions either truthfully or untruthfully. In fact, one could argue that it may be more beneficial to her if she did lie and say it did not happen, as her new husband was in attendance while she was being asked some very detailed questions about her sexual encounter with you.
>
> You told the investigator that you didn't know Ms. Arnestad nor Ms. Gregg. However, during the pre-disciplinary meeting, you did appear to remember them and described them as smelling like smoke, old, and overweight. This leads me to believe that you were untruthful with the investigator and therefore more likely than not, untruthful about the additional statements you made.
>
> I found that you exchanged phone numbers and socialized away from work with Ms. Arnestad, whom you met in the MCC Visit Room and that she was an associate of an incarcerated offender.
>
> I found that you did not report any personal communications or relationships with any known family members or associates of offenders.
>
> In addition, the MCC PREA Review Committee found the allegations regarding your misconduct to be substantiated.

In determining the appropriate sanction, the superintendent reviewed the investigation materials and Waggeh's response, as well as his work history, length of service, training provided, and personnel file. The superintendent explained his reasoning and conclusion:

> It is very concerning to me is that [sic] you have taken no responsibility for your actions. Your behaviors have caused significant harm to your credibility and the public we serve and your persistent misconduct has negated any confidence I had that you are capable of honestly and effectively performing your duties as a Correctional Officer in the future. In the correctional environment, sometimes it comes down to the word of an offender versus a staff member. It is imperative that we be able to rely on our staff's word.

> The comments made by you about female visitors during your pre-disciplinary meeting were extremely disrespectful and discriminatory. This behavior is not tolerated by the Department.
>
> As in your previous discipline, you have never admitted to any wrongdoing, even when there were witnesses. You have repeatedly blamed someone else instead of taking responsibility for any misconduct. Your continued lack of honesty and integrity has left me with no confidence that your credibility can be restored.
>
> Accordingly, I have determined that discharge as outlined in paragraph one of this letter is the only acceptable level of discipline. Any lesser sanction would not express the seriousness with which I view your misconduct, deter others, or maintain the mission of the agency.

In response to DOC's motion for summary judgment, Waggeh submitted his own declaration and a declaration of counsel with documents attached including a copy of an order issued by the Office of Administrative Hearings for the Employment Security Division, a declaration of a longtime DOC employee at the facility that had been prepared for a different case, and a proposed settlement agreement that DOC had offered to Waggeh. DOC objected to portions of the declarations and moved to strike those portions. The court granted the motion to strike in part as to the employment security findings and evidence of settlement negotiations submitted as exhibits to the declaration of Waggeh's attorney. The court denied the motion as to the remainder of the declarations.

Waggeh's declaration stated that he was born in Gambia, immigrated to the United States from West Africa in 2002, and became a United States citizen in 2010. He asserted that he is Muslim and rarely drinks alcohol. Waggeh denied having a sexual relationship with Gregg or a social relationship with Arnestad. He also stated that many of the prior incidents that appeared in his personnel file were

based on false accusations. He identified the 2011 drug investigation as "particularly humiliating and upsetting." He explained that bloodshot eyes are "a common pervasive condition for people who have grown up in Africa" and said that he drove his own car home even after being offered a ride because he "fear[ed] [that] they might plant some drugs in the car overnight if [he] left it."

Waggeh also submitted a declaration of Sergeant Melvin Hopkins that had been prepared for a separate lawsuit against DOC. Hopkins stated that he had worked at the MCC for nineteen years and had observed racism and sexism there. He described the workplace culture as "a very cliquish, 'good old boys' environment" and noted that, "[i]f the good old boys didn't want you around, they often tried to make you miserable enough that you would want to quit." He stated an observation that there were many Black employees who grew tired of fighting the racism at the facility and eventually left their jobs.

Other documents included relevant sections of the investigator's reports and an email from another corrections officer to the investigator in response to her inquiry about one of the alleged incidents. The corrections officer noted that he had not witnessed Waggeh harass any offender or visitor during the officer's "short stay at MSU Visiting" and described Waggeh as courteous, cheerful, and polite. Waggeh also submitted DOC's answer to an interrogatory asking how many lawsuits were filed against DOC claiming discrimination, sexual harassment and hostile work environment, retaliation, and/or whistleblowing during the period of Waggeh's employment. DOC objected to the interrogatory and, without waiver of its objection, answered "58."

The court granted summary judgment in favor of DOC as to Waggeh's claims of defamation, retaliation, violation of public policy, breach of good faith and fair dealing, wrongful termination based on discrimination, and harassment.[4] Summary judgment was denied as to the claim of hostile work environment. Waggeh then moved for voluntary dismissal without prejudice of his sole remaining claim, which was granted.

Waggeh filed a motion for reconsideration seeking reinstatement of his "causes of action regarding unlawful termination/discharge, retaliation, and discrimination based on race, color, national origin, and creed" and challenging the court's decision to strike the evidence of the settlement agreement. The court denied the motion for reconsideration. In its written ruling, the court noted that it had given each side substantial time to argue its case on summary judgment and had asked Waggeh what specific facts supported his claims. Waggeh "informed the Court that he had other facts/evidence which he expected to introduce at trial and had not provided them in his summary judgment pleadings because the hearing was not the trial." The court noted that it was never provided the information that Waggeh claimed to be reserving for trial.

Waggeh appealed. DOC cross-appealed.

---

[4] Although the court stated that it was granting summary judgment on the claim of sexual harassment, Waggeh clarified that his claim did not allege harassment of a sexual nature.

- 13 -

ANALYSIS

I.    Summary Judgment

Waggeh argues that the trial court erred in granting summary judgment for DOC on his claims of unlawful termination/discharge, retaliation, and discrimination based on race, color, national origin, or creed.  He argues that there were genuine issues of material fact including whether he engaged in an improper sexual relationship with Gregg, whether he engaged in an improper social relationship with Arnestad, and whether he had sufficient contacts with Arnestad outside the workplace to require a report to DOC.

We review summary judgment de novo, engaging in the same inquiry as the trial court.  Christensen v. Grant County Hosp. Dist. No.1, 152 Wn.2d 299, 305, 96 P.3d 957 (2004).  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law because, given the evidence, reasonable persons could reach only one conclusion.  CR 56(c); Walston v. Boeing Co., 181 Wn.2d 391, 395, 334 P.3d 519 (2014).  The court must view all facts and reasonable inferences from the facts in the light most favorable to the nonmoving party.  Christensen, 152 Wn.2d at 305.

The moving party bears the burden to show that there is no genuine issue of material fact.  Walston, 181 Wn.2d at 395.  "A genuine issue is one [upon] which reasonable people may disagree; a material fact is one controlling the litigation's outcome."  Youker v. Douglas County, 178 Wn. App. 793, 796, 327 P.3d 1243 (2014).  If this showing is made, the nonmoving party must present evidence demonstrating an issue of material fact.  Walston, 181 Wn.2d at 395–96.  If the

nonmoving party fails to demonstrate such an issue, summary judgment for the moving party is appropriate. Id. at 396.

The Washington Law Against Discrimination (WLAD) prohibits employers from discharging or discriminating against any employee on the basis of a protected characteristic. RCW 49.60.180(2), (3); Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 526, 404 P.3d 464 (2017). It also prohibits employers from discharging any employee because the employee opposed discriminatory practices forbidden by the WLAD. RCW 49.60.210. The WLAD is to be construed liberally to accomplish its purpose of preventing practices of discrimination, which "threaten[ ] not only the rights and proper privileges of [Washington's] inhabitants but menace[ ] the institutions and foundation of a free democratic state." RCW 49.60.010; RCW 49.60.020.

Summary judgment is often inappropriate in discrimination cases under the WLAD because "the evidence 'will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury.'" Johnson v. Chevron U.S.A., Inc., 159 Wn. App. 18, 27, 244 P.3d 438 (2010) (quoting Davis v. W. One Auto. Grp., 140 Wn. App. 449, 456, 166 P.3d 807 (2007)). However, the plaintiff must do more than express an opinion or make conclusory statements to overcome a motion for summary judgment. Marquis v. City of Spokane, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). "The worker must establish specific and material facts to support each element of his or her prima facie case." Id. Summary judgment remains appropriate when the plaintiff fails to

raise a genuine issue of material fact on one or more prima facie elements of the claim.  Johnson, 159 Wn. App. at 27.

Contrary to counsel's assertion at oral argument, the Washington Supreme Court recently reaffirmed that  discrimination claims under the WLAD are analyzed under the three-step burden-shifting scheme established by the United States Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Mikkelsen, 189 Wn.2d at 526–27.  Under this framework, the plaintiff bears the initial burden to establish a prima facie case of discrimination.  Id. at 527.  If the plaintiff is able to make out a prima facie case, a rebuttable presumption of discrimination arises.  Id.  The burden then shifts to the defendant to "'articulate a legitimate, nondiscriminatory reason for the adverse employment action.'"  Id. (quoting Scrivener v. Clark Coll., 181 Wn.2d 439, 446, 334 P.3d 541 (2014)).  The employer's burden is one of production, rather than persuasion.  Id. at 533.  The employer need only introduce evidence that, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.  Id.  It does not need to persuade the court that it was actually motivated by the proffered reason to satisfy its burden.  Id.

If the defendant makes this showing, the burden shifts back to the plaintiff to produce sufficient evidence that the defendant's articulated nondiscriminatory reason was a pretext.  Id. at 527.  The plaintiff can meet this burden by "offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason

is legitimate, discrimination nevertheless was a substantial factor motivating the employer." Id.

If all three burdens are met and the record contains reasonable but competing inferences of both discrimination and nondiscrimination, "'it is the jury's task to choose between such inferences'" and summary judgment is not appropriate. Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 186, 23 P.3d 440 (2001), abrogated on other grounds by Mikkelsen, 189 Wn.2d 516 (quoting Carle v. McChord Credit Union, 65 Wn. App. 93, 102, 827 P.2d 1070 (1992)). Washington courts have recognized that direct evidence of discrimination is often elusive, so inferential and circumstantial evidence may be sufficient to show pretext. Griffith v. Schnitzer Steel Indus., Inc., 128 Wn. App. 438, 447, 115 P.3d 1065 (2005); Mikkelsen, 189 Wn.2d at 526. However, an employee's subjective beliefs and assessments about their job performance are irrelevant. Griffith, 128 Wn. App. at 447. Retaliation claims are analyzed under the same three-step McDonnell Douglas burden-shifting framework as discrimination claims. Cornwell v. Microsoft Corp., 192 Wn.2d 403, 411, 430 P.3d 229, 234 (2018).

The parties focus their arguments regarding both the discrimination and retaliation claims on the third step of the McDonnell Douglas analysis. We will assume for the purposes of this opinion that Waggeh satisfied his burden to raise presumptions of discrimination and retaliation and that DOC satisfied its burden to articulate a legitimate, nondiscriminatory reason for Waggeh's termination.

DOC contends that Waggeh failed to show that there was a genuine issue of material fact that DOC's articulated reason was pretextual or that, despite the

legitimate reason, discrimination or retaliation played a significant factor in his termination. To create a pretext issue, the employee must present some evidence that the employer's stated reason for termination is unworthy of belief. Kuyper v. Dep't of Wildlife, 79 Wn. App. 732, 738, 904 P.2d 793 (1995). This requires a showing that, for example, the articulated reason for termination has no basis in fact, was not really a motivating factor for the decision, lacks temporal connection to the decision, or was not a motivating factor for employment decisions for other employees in the same situation. Id. at 738–39.

In response to DOC's motion for summary judgment, Waggeh submitted a declaration in which he denied that the instances of alleged misconduct that led to his termination had ever occurred, as he had during the investigation. DOC contends that Waggeh's denials are not sufficient to create an issue of fact, citing Domingo v. Boeing Emp. Credit Union, 124 Wn. App. 71, 98 P.3d 1222 (2004), abrogated on other grounds by Mikkelsen, 189 Wn.2d 516. In Domingo, this court found that the plaintiff's denial that she ever engaged in violent behavior was insufficient to raise an issue of fact as to whether the employer's stated basis for dismissal was pretextual. 124 Wn. App. at 88. Domingo did not dispute that her co-workers complained about her conduct, that her supervisor investigated the complaints, or that she received a written warning about violent behavior. Id. at 89. The court found that, because Domingo presented no evidence that her supervisor did not, in good faith, believe that Domingo engaged in violent conduct, she had not demonstrated that the articulated reason was a pretext. Id. at 88–89.

Domingo cited for support a federal case in which a substitute teacher had been removed after an investigation of a report that she had used a racial epithet, even though she denied the allegation.  Id. at 88 (citing Gill v. Reorganized Sch. Dist. R–6, Festus, Mo., 32 F.3d 376 (8th Cir.1994)).  Domingo imported the Eighth Circuit's reasoning that

> Whether Gill did or did not engage in the conduct reported to the superintendent and whether the superintendent should have relied on the assistant principal's investigation are "irrelevant because [this evidence] merely questions the soundness of the [superintendent's decision]." Incorrect thinking on the superintendent's part does not prove the school district's explanation is a pretext.

Id. at 88–89 (quoting Gill, 32 F.3d at 379 (citations omitted) (alterations in original)).

At oral argument, Waggeh pointed to a case in which the Washington Supreme Court suggested that a plaintiff's denial of misconduct may be sufficient to create a genuine issue of material fact.  See Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 364, 753 P.2d 517 (1988), abrogated on other grounds by Mikkelsen, 189 Wn.2d 516.  In Grimwood, the court found that the plaintiff did not meet his burden to create a genuine issue of fact that the employer's stated reasons for termination were pretextual when his affidavit in opposition to summary judgment presented only his conclusions and opinions as to the significance of the facts set forth in the defendant's affidavit.  Id. at 360.  The court noted that the plaintiff's conclusory statements that he was not uncooperative and that his job performance was not substandard did not counter the employer's statements of noncooperation based on specific incidents.  Id.  However, the court noted that "[i]t would be different if plaintiff had claimed the incidents did not occur; for example,

had he said that he had, in fact, completed all employee evaluation forms when defendant said he did not, an issue of fact would have existed." Id.

Here, Waggeh submitted a sworn declaration denying that he had committed the acts that led to his termination. He also presented evidence that, he argued, showed that the investigation did not support the superintendent's findings that he had engaged in the misconduct. For example, Gregg stated that she met Waggeh in February or March of 2011, while Arnestad said that she had provided the introduction in the fall of 2011. Also, the investigator noted that Gregg thought she remembered a tattoo on Waggeh's arm, but Waggeh showed his arms to the investigator and no tattoo was visible. Waggeh presented a declaration from a longtime employee of the facility describing his perception of racial discrimination at the facility.

Even viewing all facts in the light most favorable to Waggeh, he did not meet his burden to produce evidence that DOC's reason for termination was pretextual. Like Domingo, although Waggeh denied committing the misconduct, he presented no evidence that DOC did not, in good faith, believe that he had engaged in the misconduct. After receiving the reports of Waggeh's alleged misconduct, the investigator looked into the allegations thoroughly, interviewing multiple witnesses and examining relevant documents. When considered in the context of the investigation as a whole, the inconsistencies in the reporting witnesses' statements do not preclude a good faith belief that Waggeh engaged in the misconduct. Nor does it show bad faith that DOC discounted Waggeh's denials. Waggeh's personnel file documents the erosion of his credibility in the eyes of the

superintendents after multiple denials of misconduct even when witnessed by other staff members and uninterested parties, particularly as the frequency and seriousness of incidents steadily increased over the course of his employment.

Grimwood does not compel a different result. The Grimwood court's hypothetical statement that the analysis "would be different if plaintiff had claimed the incidents did not occur" appears to refer to the analysis of whether the plaintiff's work was satisfactory rather than whether the stated reason for termination was pretextual. See 110 Wn.2d at 360–61. Waggeh has not satisfied his burden to show that DOC's articulated nondiscriminatory and nonretaliatory reason for termination was a pretext. We affirm summary judgment for DOC.[5]

II.     Motion to Strike

Waggeh contends that the court erred in striking evidence of a proposed settlement agreement offered to him by DOC to settle claims between Waggeh, DOC, and Waggeh's union. We review de novo a trial court ruling on a motion to strike evidence made in conjunction with a summary judgment motion. Rice v. Offshore Sys., Inc., 167 Wn. App. 77, 85, 272 P.3d 865 (2012).

All relevant evidence is admissible unless its admissibility is otherwise limited by statute, rule, or constitutional requirements. ER 402. Evidence is relevant if it has any tendency to make the existence of any fact of consequence

---

[5] DOC also argues in its briefing that Waggeh failed to support his arguments that the court erred in granting summary judgment on his claims of termination in violation of public policy, termination in violation of a collective bargaining agreement, defamation, or breach of the covenant of good faith and fair dealing. Despite counsel's comment at oral argument that he was seeking remand for trial on all remaining claims, Waggeh clearly stated in his reply brief that he is not appealing the dismissal of these claims. We decline to review summary judgment on these claims in the absence of argument by the appellant.

to the determination of the action more or less probable. ER 401. The threshold for relevancy is low, and even minimally relevant evidence is admissible. Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 669, 230 P.3d 583 (2010). However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. ER 403.

Under ER 408, evidence of offering or promising to furnish valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim. This is because offers of settlement are favored in law, and admission of those offers would discourage parties from attempting to settle cases. Knapp v. Hoerner, 22 Wn. App. 925, 930, 591 P.2d 1276 (1979). Also, this rule recognizes that an offer of settlement may not necessarily indicate that the offeror believes that the adversary's claim has merit. Bulaich v. AT&T Info. Sys., 113 Wn.2d 254, 263–64, 778 P.2d 1031 (1989). However, the rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness. ER 408.

Waggeh argued that the proposed settlement agreement was admissible because it was offered to show DOC's discriminatory intent and that DOC's stated reason for termination was a pretext. He argued that DOC's offer to reinstate him showed that it did not actually base his dismissal on the claimed policy violations. The trial court explained in the order denying reconsideration that, generally, the probative value of offers to compromise "is greatly outweighed by the danger of unfair prejudice because settlement offers may have nothing to do with liability."

The court acknowledged Waggeh's arguments for admission, but noted that ER 408 does not allow settlement offers to be used as proof of liability and found that Waggeh had not "identified specific facts that support the consideration of the evidence of compromise under the other reasons exception to ER 408."

The court did not err in striking the evidence of the settlement offer. Waggeh's stated purpose for offering the evidence was to persuade the trier of fact that DOC's articulated reasons for firing him were pretextual. By offering the evidence as proof of the ultimate issue in his case—whether DOC's actions were discriminatory—Waggeh is seeking to use the evidence as proof of liability. The court did not err in excluding this evidence under ER 408.

Affirmed.[6]

WE CONCUR:

_____

_____          Andrus, A.C.J.

---

[6] Because we affirm the order granting summary judgment, DOC concedes that any error made by the trial court in considering inadmissible evidence is harmless and we need not consider its cross-appeal.